UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:20-CR-432 SRC/PLC ) |
| RONALD SCOTT, | ) ) |
| Defendant. | ) |

## Report and Recommendation

This matter is before the Court following an evidentiary hearing on Defendant's Motion to Suppress Statements [ECF No. 55].  Defendant asserts that his incriminating statement followed an "explicit promise that the detectives would be able to get the prosecuting attorney to go easy on him and the implied promise that he could stay out of jail…."[1]  The Government filed a response in opposition arguing that relevant case law requires "more than promises of leniency to render a confession involuntary" [ECF No. 58].

The Court held an evidentiary hearing.  Thereafter, the parties filed post-hearing briefs [ECF Nos. 91 and 92].[2]

---

[1] This ground (promise of leniency) for suppression is not raised in Defendant's post-hearing memorandum.  The Court construes the absence of any discussion as abandonment of the issue but nevertheless addresses it below.

[2] In his post-hearing brief, Defendant claimed that his confession was involuntary because detectives referenced "what happened to Mike Brown."  However, Defendant's motion to suppress is entirely devoid of any suggestion that a reference to "Mike Brown" caused his confession.  Although Defendant failed to even allude to either a threat of violence or "Mike Brown" in his motion to suppress, and an issue initially raised in a post-hearing brief is untimely, the Court exercises its discretion to consider the issue.

**Factual Background**

### A. Detective Carlos Ingram

The Government called Detective Carlos Ingram, a thirteen-year veteran of the St. Louis Metropolitan Police Department ("SLMPD") to testify to events occurring on September 8, 2020. On that date, Detective Ingram and SLMPD Detective Robert Trim interviewed Defendant regarding an armed robbery of a McDonald's on North Tucker Boulevard in St. Louis. The detectives recorded the interview, and the Court admitted the recorded interview at the hearing.

At the commencement of the interview, Detective Trim provided Defendant with his <u>Miranda</u> rights. Defendant stated that he understood his rights. Detective Ingram denied threatening Defendant, promising him any particular results, or touching him. The interview lasted forty-five minutes and concluded because Defendant did not want to continue speaking to the detectives.

Following the interview, Defendant asked to use the restroom. While walking to the restroom with Detective Ingram, Defendant inquired about his bond and length of his "hold." Defendant also asked Detective Ingram if the detectives believed him, and Detective Ingram replied "no." Detective Ingram elaborated as follows:

> Hey, just based on the information that we have against you, I mean it just doesn't look good, and if you, you know, want to stick with your story fine, but at the end of the day, it's up to the judge and the jury.

Defendant continued to ask about his bond and Detective Ingram explained the process including that detectives would present the case to the Circuit Attorney and "they" would "make the determination whether or not the charge would be issued, but [the detectives had] no control over that." Shortly thereafter, Defendant and Detective Ingram walked outside the SLMPD headquarters in preparation for transport to the City Justice Center. While walking to Detective

Ingram's patrol car, Defendant told Detective Ingram "he wanted to make things right." At that point, Detective Ingram, Detective Trim, and Defendant returned to the interview room. Detective Trim administered a second Miranda warning.

In the second interview, Defendant "admitted that he had went in there with him and his buddy Keith and robbed the McDonald's. They took the till drawer and then drove off in his friend's vehicle after the robbery." In connection with the second interview, Detective Ingram denied threatening Defendant with physical harm or promising him a "particular sentence or outcome."

Defense counsel cross-examined Detective Ingram. Detective Ingram denied saying anything to Defendant about "speaking to the prosecutor on the case about going lenient" on Defendant. Detective Ingram also denied suggesting that if Defendant spoke to him further that Defendant might be released on "some sort of lower bond."

The Government recalled Detective Ingram to testify in rebuttal. Detective Ingram stated that he did not hear any comment about Michael Brown.

**B. Defendant**

Defendant testified that on September 8, 2019, he was driving with a friend when police officers stopped him on Jennings Station Road. Defendant assumed officers "ran" his name. Thereafter, officers arrested him and transported him to Jennings Police Department. After waiting approximately an hour or an hour and a half, officers transported Defendant to SLMPD headquarters. During transport, officers did not talk to Defendant about his "case."

Once in an interview room at SLMPD headquarters, Defendant waited for approximately thirty to forty-five minutes. Defendant was then questioned in a recorded interview.

Following the interview, Defendant and the detectives walked to a patrol car for transport

3

to the City of St. Louis Justice Center. Defendant recounted that one of the detectives stopped Defendant "mid-traction" and stated the following:

> Look, we know it was you. We can tell the prosecutor to be lenient on you. Keith Dawson [sic] is out right now. You know what happened with Mike Brown. We need you to go back in this room and cooperate.

Defendant further stated that when "[the detective] said the Mike Brown situation, I automatically thought I was going to be killed." Elaborating on "the Mike Brown situation," Defendant explained:

> You know what happened to Mike Brown. In my mind I'm thinking, if I don't say nothing they continue to do something to me. Something's about to happen. So I - - once again, I still said nothing. I just went in the room and I just repeated what they just basically said.

On cross-examination, Defendant admitted that detectives told him "it's not up to us" rather "that's up to the prosecutor to charge you…." He also acknowledged that Detective Ingram was with him the "entire time" and that it was Detective Anderson (in Detective Ingram's presence) who commented about Mike Brown. Finally, when asked whether the "Mike Brown" comment caused him to "lie to the police in [his] second interview," Defendant testified as follows:

> Not just - - not even just that. Once again, he told me Mike Brown, but he told me, I will talk to the prosecutor. And, once again, really at that time I don't even know what a prosecutor was. Once again I ain't never been in this situation. But, yes, ma'am, once he told me that when we was outside, I came back in the room and that's when I said what I said. I repeated what was basically just said.

Defendant further testified as follows:

> Actually, I just repeated what they just questioned me about. So I said I did it because at that point, I'm nervous. I ain't never been in this situation before. I never been here before. And I'm not trying to make it a white and black thing, but I'm a young black man, and things that happen to us every day that it doesn't get televised or recognized. So I told to put my hands, not to get hurt or to make it back to my son, so I told them, I said what they wanted me to say.

4

### C. Videotaped Interviews

The recorded interview between Defendant and Detectives Ingram and Trim commenced at 2:46 P.M. with Detective Trim administering Defendant Miranda warnings. After each warning, Detective Trim asked Defendant if he understood the warning to which Defendant replied "yes." During the interview, Detective Ingram was present for the duration and he and Detective Trim both questioned Defendant. The tone was conversational and Defendant evinced neither fear nor an inability to understand the questions. While speaking to Defendant, Detective Ingram offered Defendant water and chips.

During the interview, Defendant agreed to a buccal swab and signed a consent form. The detectives explained to Defendant the information they obtained from Keith, Defendant's friend, who was charged with committing the robbery the detectives were investigating. According to the detectives, Keith described the robbery and implicated Defendant. The detectives reminded Defendant midway through the interview that "if you choose to say nothing, that's your choice." Defendant refused to admit a connection to the robbery over the course of the forty-five-minute interview.

Towards the end of the interview, which Defendant elected to terminate, Defendant asked what would happen. Detective Trim explained that he would present the case to the Circuit Attorney, and "they decide" whether to issue a warrant. Defendant was also advised that although a bond likely would be set, Defendant had bench warrants in St. Charles County and the City of St. Charles. At the conclusion of the interview, Defendant requested to use the restroom and Detective Ingram escorted Defendant out of the interview room for that purpose.

Detectives Ingram and Trim conducted a second recorded interview with Defendant after he told them he wanted to "set the record straight." The interview commenced at 5:21 P.M. in the

5

interview room the detectives previously used and lasted approximately fifteen minutes. Detective Ingram first asked Defendant if he "needed anything," like a soda. Next, Detective Ingram restated Defendant's statement that he wanted to set the record straight. Immediately thereafter, Detective Trim read Miranda warnings and Defendant verified he understood after Detective Trim read each separate warning. Following recitation of the Miranda warnings, Detective Ingram asked Defendant: "Do you wish to talk to us?" Defendant assented.

Detective Ingram asked open-ended questions over the course of approximately fifteen minutes, including: "tell us what happened," "what was your role," "take me through it," and explain "what you did." Defendant stated that he robbed the McDonald's and that he used a weapon and threatened the manager. Defendant acknowledged he opened the cash register using knowledge he acquired as a McDonald's employee. Defendant further stated he took the cash register drawer from the McDonald's, that he obtained several hundred dollars, and that his accomplice was Keith.

During the interview, the detectives used a conversational tone. The detectives were not aggressive or threatening. Defendant was cooperative and calm. He did not appear either afraid or nervous. Defendant asked questions about the process and the detectives explained again that whether a warrant would issue was "all up to the Circuit Attorney." Specifically, Detective Trim stated we "can't promise you nothing."

## Discussion

Defendant contends in his motion that his incriminating statement "was not voluntary as his will was overborne by the enticement of law enforcement promises" [ECF No. 55]. Defendant argues in his post-hearing brief that "his mind was changed" by the "threat to his life" implied by an officer's mention of "another young African American male, 'Mike Brown'" [ECF No. 91].

6

More specifically, Defendant asserts that "[a] white St. Louis City detective threatening a young African American male, in the unsurveiled (sic) back lot of Police Headquarters, is a credible threat."

The Government counters, in essence that, even if true, a mere promise of leniency, in the absence of other evidence of involuntariness is an insufficient basis for suppression. With respect to Defendant's argument in his post-hearing brief that the "Mike Brown" comment rendered his statements involuntary, the Government contends that: (1) the credible evidence fails to establish a law enforcement officer mentioned "Mike Brown;" and (2) even if the officer made the alleged statement it did not result in a coerced statement.

### A. Applicable legal principles

Due process imposes on a court the duty to ascertain the voluntariness of a defendant's confession whether the confession arises out of "inherently coercive" police conduct or under circumstances suggesting "the confession is unlikely to have been the product of a free and rational will." Miller v. Fenton. 474 U.S. 104, 110, (1985) (citing Ashcraft v. Tennessee, 322 U.S. 143, 154, (1944) for first quotation and Mincey v. Arizona, 437 U.S. 385, 401, (1978) for second quotation). There is no "talismanic definition of 'voluntariness,'" and a court must determine whether a statement was voluntary by looking at the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 224-26, (1973). See also United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) ("To determine whether a statement is voluntary [the Court] examines the totality of the circumstances…."); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). Race is a factor that may be considered when assessing the voluntariness of a defendant's consent after a seizure has occurred, but it is not "decisive." See United States v. Mendenhall, 446 U.S. 544, 558 (1980) (significance of threat that a twenty-two-year-old Black woman felt when evaluating

voluntariness of consent under totality of circumstances); United States v. Knights, 989 F.3d 1281, 1288 (11th Cir. 2021).

The Supreme Court has further explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'…." Colorado v. Connelly, 479 U.S. 157, 167, (1986). See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002); United States v. Robinson, 20 F. 3d 320, 322 (8th Cir. 1994). In short, "[a] statement is involuntary when it [is] extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). However, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001), (quoting Dickerson v. United States, 530 U.S. 428 (2000) (quoting Berkemer v. McCarthy 468 U.S. 420, 433, n. 20 (1984). (citation omitted)). Finally, "[t]he government bears the burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements." United States v. Williams, 720 F.3d 674, 691 (8th Cir. 2013) (citation omitted).

Specifically with respect to promises of leniency, "even if [the defendant] was confused and confessed to the crime on the mistaken belief that he had been promised leniency (or even if he had been promised some form of leniency), this circumstance alone would not make [the defendant's] confession involuntary." Kilgore, 58 F.3d at 535 (citation omitted). See also United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996) (promise to advise United States attorney of a defendant's cooperation does not transform voluntary statement into involuntary statement); United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that neither a promise

8

of leniency, an expressed disbelief in the defendant's statements, nor lies to the defendant about evidence against him necessarily render a confession involuntary). Likewise, "[t]he statement to an accused that telling the truth 'would be better for him' does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary." Simmons, 235 F.3d at 1133.

## B. Analysis

Defendant's claim that his statements were coerced by: (1) either a promise of leniency; or (2) a single reference to Michael or Mike Brown is not supported by the record before this Court. First, it is undisputed that Detective Trim administered Miranda warnings to Defendant multiple times. Second, a review of the videotaped interviews establishes that Defendant clearly understood his Miranda rights and was calm and cooperative during his interviews. Defendant's only substantive questions concerned bond and were politely answered by the detectives. Defendant chose to terminate his initial interview. Neither of the officers conducting the interviews exhibited any threatening behavior or acted in a manner that appeared to intimidate Defendant.

As Defendant acknowledges in his motion, to succeed on a motion to suppress, the evidence must demonstrate that Defendant's will was overborne. Here the credible evidence both through Detective Ingram's testimony and the videotaped interviews establishes that the detectives did not promise leniency. Moreover, even if any statements might be construed as a promise of leniency, Defendant's will was not overborne. He freely, and with little effort on the detectives' part, admitted his role in the alleged robbery.

With respect to the alleged comment regarding "Mike Brown," the testimony from Detective Ingram, who Defendant admitted was present when Defendant claimed a white detective mentioned "Mike Brown," and who denied the comment was made, is more credible than

9

Defendant. To be more precise, there is no credible evidence supporting the use of the words "Mike Brown" to threaten Defendant. In the videotaped interview that occurred immediately after the comment was supposedly uttered, Defendant does not appear frightened or nervous. In fact, his overall demeanor was identical to his demeanor prior to the alleged comment. Moreover, the questions used to elicit Defendant's responses were open-ended. The interview was short and Detective Ingram, who is African-American, handled the substantive questioning. Defendant readily answered all questions regarding his participation with minimal prompting. His only hesitation involved questions regarding Keith's (his alleged accomplice) participation. Finally, Defendant agreed with Detective Ingram's statement that he voluntarily returned to the interview room to "set the record straight." Nothing about the events depicted either in the second videotaped interview or described in the credible testimony at the evidentiary hearing suggests any degree of coercion, let alone, fear of imminent death.

In short, the totality of the circumstances before this Court demonstrates that the Government proved by a preponderance of the evidence that Defendant's statements admitting his role in the charged crime were voluntary. Accordingly, the Court recommends denial of Defendant's motion to suppress.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 55] be **DENIED**.

**IT IS FURTHER ORDERED** that at the direction of United States District Judge Stephen R. Clark, this matter will be set for trial upon further order of the Court.

**The parties are advised that they have fourteen (14) days after service of this Report and Recommendation in which to file written objections to it**, unless an extension of time for

good cause is obtained.  Failure to file timely objections may result in a waiver of the right to review.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.

/s/ Patricia L. Cohen
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of October, 2021